PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

            *Plaintiff-Appellee,*

v.

LEEANDER JEROME BLAKE,

            *Defendant-Appellant.*

No. 07-4619

UNITED STATES OF AMERICA,

            *Plaintiff-Appellee,*

v.

LEEANDER JEROME BLAKE,

            *Defendant-Appellant.*

No. 07-4827

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:06-cr-00394-WMN)

Argued: May 15, 2009

Decided: July 2, 2009

Before WILKINSON and TRAXLER, Circuit Judges,
and C. Arlen BEAM, Senior Circuit Judge of the United
States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Judge Wilkinson and Senior Judge Beam joined.

---

## COUNSEL

**ARGUED:** Kenneth Wendell Ravenell, Baltimore, Maryland, for Appellant. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

TRAXLER, Circuit Judge:

Leeander Jerome Blake raises numerous challenges to his conviction and sentence for offenses arising out of a carjacking that caused the death of the victim. We affirm.

### I.

On the evening of September 19, 2002, Blake and Terrance Tolbert walked into a Maryland neighborhood with a gun, looking for someone to carjack. Blake pointed out 51-year-old Straughan Lee Griffin, who had just arrived home from work and was in the process of unloading his Jeep Grand Cherokee in front of his home. The men approached Griffin and shot him in the head. They then drove away in his vehicle, running over Griffin in the process. Griffin was transported to a nearby hospital, where he was pronounced dead.

On October 25, 2002, Tolbert was arrested, and he made statements implicating Blake. Tolbert told police that he was with Blake on the night Griffin was murdered, that Blake had a gun, and that Blake shot Griffin, took Griffin's keys, and drove his vehicle from the scene.

Based on this statement, the lead Annapolis police investigator in this case, Detective Williams Johns, applied for an arrest warrant for Blake and a search warrant for Blake's residence. Using the information in Detective Johns's application, a Maryland state district court commissioner issued the requested warrants, determined the offenses Blake would be charged with, and generated a statement of charges.

At around 5:00 a.m. on October 26, a dozen officers executed the warrant at Blake's home. They entered with guns drawn and found Blake watching television. They ordered him to lie on the floor and then arrested and handcuffed him. He was wearing only boxer shorts and a T-shirt. The police forcibly took him away, giving him no time to dress or put on his shoes.

When Blake arrived at the Annapolis Police Department, he was brought to an intake room. Detective Johns arrived soon after. According to Johns, he and Corporal Thomas Hannon, who was assisting Johns in the investigation, spoke to Blake in a non-aggressive, conversational tone without discussing the possible penalties that Blake faced. Johns testified that Blake was not given the statement of charges at that time because it contained Tolbert's version of events, and Johns did not want Blake to be able to tailor his version of events to Tolbert's. According to Johns, Blake appeared calm and was not wearing handcuffs. Johns read Blake his *Miranda* rights and provided a waiver outlining each right. Blake immediately requested a lawyer. As a result, Johns stopped the interrogation. Thus, at around 5:25 a.m., Blake was transferred to a prison cell and left alone.

Thirty-five minutes later, Detective Johns returned to Blake's cell. According to Johns, his purpose in returning was to give Blake a copy of the statement of charges. *See* Maryland Rule 4-212(e) (requiring police to provide a copy of this statement "promptly" after arrest). Johns was accompanied by Officer Curtis Reese, who had driven the police car that trans-

ported Blake to the Annapolis Police Department but who was not involved in the investigation.

Johns gave Blake the statement, read the charges as they were described on the first page, and told Blake, "it's very serious, this is your copy, you need to read it over." J.A. 744. The second and third pages contained a brief description of each charge as well as the maximum penalty for each offense. Unbeknownst to Johns, the maximum penalty listed for the first-degree murder charge was "DEATH." J.A. 518. Although the death penalty is indeed the maximum penalty that can be imposed in Maryland for first-degree murder, Blake himself could not have received the death penalty because he was only 17 years old on the night of the murder, and thus statutorily ineligible for the death penalty in Maryland. *See* Md. Code Ann., Crim. Law § 2-202(b)(2)(i) (West 2009). The application section of the statement of charges contained the factual summary, that Johns had prepared, of the conduct underlying the charges, including an accusation by Tolbert that Blake was the one who shot Griffin and drove Griffin's vehicle from the scene.

As Johns turned to leave, he heard Reese say, in a loud and confrontational voice, "I bet you want to talk now, huh?" J.A. 745-46, 819 (internal quotation marks omitted). Blake did not respond. Detective Johns was surprised by Reese's remark, and immediately physically guided Reese out of the cellblock. As he did so, he loudly stated to Reese words to the effect of "no, he doesn't want to talk to us, you can't say anything to him, he asked for a lawyer." J.A. 747. According to Johns, he spoke loudly to prevent Reese from saying anything more and to avoid hearing any response that Blake might offer. Johns reported this incident to his supervisor and included a description of it in the homicide report.

At 6:28 a.m., about one half-hour after Johns had last spoken to Blake, Johns returned to the cellblock to deliver Blake some clothing that had been brought for him. According to

Johns, Blake appeared calm. When Johns gave him the clothes, Blake asked, "I can still talk to you?" J.A. 755 (internal quotation marks omitted). Johns replied, "Are you saying you want to talk to me now?" J.A. 756 (internal quotation marks omitted). Blake replied that he was. Johns told him he would have to re-read Blake his *Miranda* rights before they could talk, to which Blake agreed. Blake, fully clothed by that time, was then walked back to the interview room, where he was re-Mirandized. Blake never made reference to the death penalty or to Officer Reese's remark at any time that day.

Blake proceeded to provide the following account of the night in question. He and Tolbert were walking around Annapolis. At one point Tolbert entered a house and emerged with a gun; when they arrived at Cumberland Court they saw a man holding some clothes beside a car with its hood up. After they walked past the man, Tolbert approached him, pulled out the gun without saying anything, and pointed it at the man's face. Tolbert pulled the trigger once and it clicked. Then he pulled the trigger again, the gun fired, and the man fell. Tolbert rolled the man over and removed the car keys from his pocket. Tolbert and Blake entered the Jeep with Tolbert in the driver's seat. Tolbert drove the Jeep from the scene. They proceeded to Glen Burnie, where they wiped down the Jeep and went to the home of a person that Blake knew as "Smalls," where Tolbert and Smalls wiped off the gun and bullets. Blake explained that, prior to Tolbert approaching the victim, Blake and Tolbert had not been looking for someone to rob. Blake also stated, "I understand I was wrong by being there, but I don't want to be blamed for the murder." J.A. 1170.

At the end of the interview, Detective Johns asked if Blake would agree to a polygraph exam, and Blake said he would. About an hour later, Blake was transported to the Maryland State Police barracks, where he met Corporal Ed White, the state police polygraph examiner. White also found Blake to be calm. After White administered the test, he told Blake that he

appeared to have been deceptive, and White asked Blake if he was holding anything back. Blake then admitted that on the day of the murder, he knew Tolbert had a gun. He also admitted that they were looking for someone to carjack, and that Blake initially noticed Griffin and pointed him out to Tolbert. After White informed Johns of the additional admissions, Blake then repeated them to White and also demonstrated how he pointed out Griffin to Tolbert.

Blake was indicted by an Anne Arundel County grand jury for first-degree murder, second-degree murder, and manslaughter. On June 3, 2003, however, a Maryland state court judge granted Blake's motion to suppress his post-arrest statements on the ground that after Blake invoked his right to counsel, the statements were obtained from Blake as the result of custodial interrogation in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). The Maryland Court of Special Appeals reversed, but the Maryland Court of Appeals later reversed the intermediate court, upholding the suppression of Blake's statements, *see Blake v. State*, 849 A.2d 410 (Md. 2004). In so doing, the Maryland Court of Appeals rejected an argument that Detective Johns cured any *Edwards* violation with his loud statement that Blake had requested a lawyer and could not be interrogated further. *See id.* at 422-23.

The state then petitioned the United States Supreme Court for a writ of certiorari. The sole issue presented was:

> When a police officer improperly communicates with a suspect after invocation of the suspect's right to counsel, does *Edwards v. Arizona*, 451 U.S. 477 (1981), permit consideration of curative measures by the police, or other intervening circumstances, to conclude that a suspect later initiated communication with the police?

*Maryland v. Blake*, 2005 WL 1400703, *i (Brief of the State of Maryland). The United States Supreme Court granted cer-

tiorari but subsequently dismissed the writ as "improvidently granted." *Maryland v. Blake*, 546 U.S. 72, 73 (2005).

On August 31, 2006, Blake was indicted by a federal grand jury for carjacking resulting in death ("Count One"), *see* 18 U.S.C.A. § 2119 (West 2000), and for related firearm violations.[1] The district court subsequently denied Blake's motion to suppress his post-arrest statements. Following a trial, the jury returned a verdict convicting Blake of the carjacking charge and of three of the four other counts.[2] Blake was sentenced to life imprisonment.

## II.

Blake first maintains that the district court erred in refusing to suppress his post-arrest statements. We disagree.

When reviewing a denial of a motion to suppress, we review factual findings for clear error and legal conclusions de novo. *See United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination "from the coercive pressures that can be brought to bear upon a suspect in the context

---

[1]The other charges were conspiracy to possess a firearm in furtherance of a crime of violence, *see* 18 U.S.C.A. § 924(o) (West Supp. 2009); possession and discharge of a firearm in furtherance of a crime of violence, *see* 18 U.S.C.A. § 924(c) (West Supp. 2009); commission of second-degree murder while possessing a firearm, *see* 18 U.S.C.A. § 924(j) (West Supp. 2009); and commission of felony murder while possessing a firearm, *see* 18 U.S.C.A. § 924(j).

[2]As per the district court's instruction, the jury, having found Blake guilty on the charge of commission of felony murder while possessing a firearm, did not consider whether he was also guilty of the charge of commission of second-degree murder while possessing a firearm, which the government subsequently dismissed.

of custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984). Part of the protection afforded by *Miranda* is the requirement that prior to any custodial interrogation, the police inform the suspect that he has the right to remain silent and the right to the presence of an attorney. *See Miranda*, 384 U.S. at 479. In *Edwards v. Arizona*, the Court held that, once a suspect in custody has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. In *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980), the Supreme Court defined what police questioning or conduct constitutes "interrogation" for purposes of assessing whether the *Edwards* rule has been violated. That decision warrants close examination here.

In *Innis*, the defendant, who was unarmed, was arrested for a robbery that had been committed just hours before with a sawed-off shotgun. *See Innis*, 446 U.S. at 293-94. He was given his *Miranda* warnings, at which time he requested a lawyer. *See id.* at 294. Three officers then began transporting him to the police station in a police car. *See id.* During the ride, two of the officers discussed with each other the need to find the shotgun since there was a school for handicapped children near the location where the suspect was arrested and because it would be unfortunate if one of the children found the gun and hurt himself. *See id.* at 294-95. At that point, the suspect told the officers that he would show them where the gun was located, and he did. *See id.* at 295. The state supreme court overturned his subsequent conviction for murder, holding that the gun and the testimony about how the defendant revealed its location were improperly admitted since they were the product of "subtle coercion" that the court deemed equivalent to *Miranda* "interrogation." *Id.* at 296 (internal quotation marks omitted).

The Supreme Court granted certiorari and reversed. The Court held that the state supreme court had erred "in equating

subtle compulsion with interrogation," *id.* at 303 (internal quotation marks omitted), and the Court defined the boundaries of what constitutes "interrogation" in this context. The Court explained:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

*Id.* at 300-01 (footnotes omitted). The Court explained that in determining whether police conduct is the functional equivalent of interrogation, the intent of the police, although not the focus, can be relevant to the determination. *See id.* at 301 n.6.

Applying that standard to the facts before it, the Court found that the officers' actions did not amount to the functional equivalent of interrogation:

> There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.* at 302-03 (footnote omitted).

In the case at bar, the district court determined that the conduct at issue also did not "rise above subtle compulsion," as it would have to do in order to constitute the functional equivalent of interrogation. J.A. 988-89. The district court found that Officer Reese's remark was merely "a snide taunt or a facetious jibe and it represented no more than a caustic commentary by Officer Reese on the evidence." J.A. 990. The court determined it to be "only an isolated, offhand remark" that "invited no reply" and noted that it "was not a lengthy harangue in the presence of the suspect." J.A. 990. Observing that "Officer Reese had no function as an investigating detective or officer in the Griffin murder case," the court found that there was no evidence whatsoever to suggest that Officer Reese had any plan to elicit an incriminating statement. J.A. 991. In fact, the court reasoned, in light of the caustic nature of the comment, that "Officer Reese never would have anticipated that [it] would have been likely to elicit an incriminating response." J.A. 991. The court concluded that "only a very

strained interpretation [of Officer Reese's remark] would allow a finding of any level of coercion or compulsion." J.A. 992.

The district court further determined that Blake's desire to waive his rights was not motivated by the offhand comment, but rather by his concern with Tolbert's accusation—included in the statement of charges—that it was Blake who was the triggerman. In this regard, the court noted Blake's statement to Detective Johns that he understood he was wrong to be with Tolbert but that he did not want to be blamed for his murder. The court also reasoned that "Blake's argument that he was intimidated by the reference in the charging documents to the appearance of death as a maximum penalty . . . strains credulity given the total absence of any reference to that during subsequent statements." J.A. 993. The court additionally found that Blake had been "calm throughout" the process. J.A. 995.

We find nothing in the district court's analysis that warrants reversal. Initially, we note that Detective Johns' provision to Blake of the statement of charges served to inform Blake that Tolbert had named him as the triggerman, that Blake was being charged with first-degree murder, and that the maximum penalty for first-degree murder was the death penalty.[3] Regardless of whether a reasonable officer would suspect that giving Blake the document was likely to garner his cooperation, no evidence suggests that Detective Johns' provision of the statement of charges was anything other than an

---

[3]Of course, as we have explained, Blake was not eligible to receive the death penalty because he was under 18 on the date of the murder. Blake does not contend that the statement of charges' listing death as the maximum penalty for the first-degree-murder charge was so deceptive that his post-arrest statements were not voluntary. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (explaining that defendant's waiver of the rights conveyed in *Miranda* warnings "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception").

action "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. In fact, it was the officers' legal duty to provide Blake with the document. *See* Md. Rule 4-212(e) (requiring police to provide copy of this document "promptly" after arrest); *see also State v. Conover*, 537 A.2d 1167, 1171 (Md. 1988) ("We do not consider it unusual for the detectives to have treated the Application for a Statement of Charges as a part of the 'packet' of charging documents."). Accordingly, providing Blake with the statement of charges did not constitute the functional equivalent of interrogation. *See Innis*, 446 U.S. at 301 (excluding "any words or actions on the part of the police [that are] normally attendant to arrest and custody" from the scope of what is functionally equivalent to interrogation); *Pennsylvania v. Muniz*, 496 U.S. 582, 603 (1990) (holding that police officer's limited inquiries regarding whether suspect understood instructions officer provided for sobriety test were not functional equivalent of interrogation in part because these inquiries "were necessarily 'attendant to'" legitimate police procedure); *South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983) (similar holding regarding officers' request that arrestee submit to blood-alcohol test); *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (holding that officer's explaining to suspect why he was arrested did not constitute the functional equivalent of interrogation); *United States v. Crisco*, 725 F.2d 1228, 1230-32 (9th Cir. 1984) (similar); *Conover*, 537 A.2d at 1169-72 (holding that officers' giving suspect copy of statement of charges, as law required, did not constitute the functional equivalent of interrogation).

In contrast to Detective Johns's provision of the statement of charges to Blake, which might have been expected to increase the chance that Blake would cooperate, a reasonable officer in Reese's position would not have anticipated that his taunt would elicit an incriminating response. Indeed, had Officer Reese paused to consider the expected effect of his taunt prior to delivering it, he very well might have predicted that it would anger Blake, thereby *reducing* the chance that he

would confess. As it is, it appears that Reese simply issued the caustic comment without ever engaging in that calculus.[4]

Blake suggests that Reese's aggressive tone could reasonably have been expected to intimidate him into cooperating. However, any such prospect was greatly minimized by the calm demeanor that Blake exhibited and the completely isolated nature of Reese's remark.[5] In fact, the isolated nature of the taunt and the concomitant reduction in its potential to intimidate also significantly lessened the chance that it would be *perceived by Blake* as some sort of "psychological ploy." *Arizona v. Mauro*, 481 U.S. 520, 527 (1987) (holding that suspect was not subjected to the functional equivalent of interrogation when he "was not subjected to compelling influences, psychological ploys, or direct questioning"); *Muniz*, 496 U.S. at 605 (holding police conduct was not the functional equivalent of interrogation when it was "not likely to be perceived as calling for any incriminating response"); *Kimbrough*, 477 F.3d at 152 (holding that police action was not functional equivalent of custodial interrogation partly because suspect would not have felt that he was being coerced to incriminate himself). In our view, the conversation in *Innis* would have been more likely to have been perceived as a ploy by the suspect therein.

---

[4]The district court's finding that Reese did not intend to elicit any incriminating response, which was not clearly erroneous, marks a significant difference between this appeal and the appeal decided in Blake's state case, wherein the trial judge had suppressed the post-arrest statements in part based on his factual finding that Officer Reese made his remark "for the purpose of getting Mr. Blake to talk." *Blake v. State*, 849 A.2d 410, 415 (Md. 2004) (internal quotation marks omitted); *see Innis*, 446 U.S. at 301 & n.6 (explaining that while the intent of the police is not the primary focus of determining whether police conduct is the functional equivalent of interrogation, it can be relevant).

[5]Blake contends that he was a terrified, shivering juvenile and thus particularly susceptible to coercion, but the district court was presented with significant evidence at odds with that account and indeed found that Blake was calm throughout the process.

Moreover, unlike the officers' conversation in *Innis*, which informed the suspect that his silence regarding the gun's location could result in serious harm to handicapped children, Officer Reese's remark provided Blake with no substantive information. The primary message that the taunt conveyed was simply that the information in the statement of charges showed Blake to be in a very difficult spot, a proposition that was obvious from a reading of that document. The taunt at most contained an *implicit suggestion* that Blake would be wise to cooperate in light of the information contained in the statement of charges. In the absence of any explanation of why cooperating, rather than conferring with a lawyer, would be the best choice for Blake, Reese could not have reasonably anticipated that his taunt would convince Blake to change his mind. Thus, we conclude that any marginal coercive effect that Reese reasonably would have expected the remark to have was even more subtle than that of the conversation at issue in *Innis*.

Officer Reese's statement is analogous to the statements at issue in *United States v. Payne*, 954 F.2d 199 (4th Cir. 1992), and *United States v. Jackson*, 863 F.2d 1168 (4th Cir. 1989), which we held not to be the functional equivalent of interrogation. In *Payne*, the defendant was arrested for selling cocaine in violation of the conditions of his release pending incarceration for a prior federal conviction. *See Payne*, 954 F.2d at 200-01. Upon his arrest, he invoked his right to counsel. *See id.* at 201. He was later transported by car to Baltimore to be turned over to the United States Marshals Service. *See id.* During the ride, an FBI agent received information that execution of a search warrant at the defendant's residence had turned up a handgun. Sometime later, the agent said to Payne, "They found a gun at your house," to which Payne responded, "I just had it for my protection." *Id.* (internal quotation marks omitted). The defendant was later charged with drug and weapons offenses and unsuccessfully moved to suppress his statement before trial as resulting from custodial interrogation after he had invoked his right to counsel. *See id.*

We affirmed the ruling on appeal. *See id.* at 204. In so doing, we noted that "the *Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Id.* at 202. We emphasized that the statement had not been intended to prompt a response, that it was isolated, and that it was not part of a psychological ploy. *See id.* at 203.

In *Jackson*, the defendant and several other men conspired to transport cocaine. *See Jackson*, 863 F.2d at 1170. When the defendant was arrested, he was informed of his *Miranda* rights and of the statutory violations that had prompted his arrest. *See id.* at 1171. When he stated that he did not know anything about cocaine, an agent stated, "Just think about Harry Payne," who was one of the defendant's coconspirators. *Id.* (internal quotation marks omitted). The defendant denied knowing a Harry Payne, and this false statement was subsequently introduced at his trial. *See id.* We affirmed the admission of the statement on appeal, emphasizing that the statement "was in the form of a declaration, not a question," that it "came only in response in a conversation [that the defendant] himself initiated," and that "it should not be construed as an attempt to solicit information from [the defendant]." *Id.* at 1172.

*Payne* and *Jackson* reflect the proposition that "in the absence of some police interference with the exercise of the right to counsel of the accused, the *Edwards* rule is to be strictly and narrowly applied." *Plazinich v. Lynaugh*, 843 F.2d 836, 838-39 (5th Cir. 1988) (holding that statement to suspect about other suspect's attempted suicide was not the functional equivalent of interrogation). Although neither statement was designed to elicit an incriminating response, both might be understood as having "tightened the screws" on the suspects such that they might have been persuaded to cooperate. We nevertheless found both statements to amount to no more than the "subtle coercion" that *Innis* explains is not the functional

equivalent of interrogation. *Innis*, 446 U.S. at 296. Reese's taunt here not only provided less information than the statements in *Payne* and *Jackson*, it was delivered in a tone less conducive to obtaining the suspect's cooperation. Concluding as we do, that it had relatively little potential to intimidate Blake (especially in comparison to the knowledge that he was alleged to be the triggerman in a murder at which he knew he had been present), we hold that the remark, like those in *Payne* and *Jackson*, was not the functional equivalent of interrogation. We therefore affirm the denial of the suppression motion.

### III.

On June 12, 2007, after the jury had been empanelled and sworn (and more than nine months after Blake had been indicted) Blake moved to dismiss the indictment for lack of subject-matter jurisdiction. He argued that the court did not possess jurisdiction since he was only 17 and a juvenile on the date of the murder, and because the government did not comply with the certification requirements of 18 U.S.C.A. § 5032 (West 2000) of the federal Juvenile Delinquency Act ("JDA"). The district court denied the motion for two reasons. First, the court found that it did not comply with Federal Rule of Criminal Procedure 12(b)(3)(A), which requires that "a motion alleging a defect in instituting the prosecution" "must be raised before trial." The district court found that Blake's motion should have been made before trial since the motion essentially asserted that the prosecution failed to take a required procedural action—obtaining a JDA certification—prior to indicting its case. The district court also concluded that Blake's motion failed on its merits because no certification was required since Blake was 21 and no federal juvenile proceedings had been pursued against him previously. Blake then sought leave to file an interlocutory appeal, which the district court denied.[6]

---

[6]Despite the denial, Blake filed a notice of appeal. The district court nevertheless proceeded with the trial, ruling that it retained jurisdiction

Blake now argues that the district court erred both in denying his motion to dismiss the indictment and in denying him leave to file an interlocutory appeal. We disagree.

The primary purpose of the JDA is "to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir. 2009) (internal quotation marks omitted). The Act provides several procedures for the handling and disposition of juveniles in the federal system. *See id.* Pursuant to § 5032,

> A juvenile alleged to have committed an act of juvenile delinquency, other than a violation of law committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months, shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

over the case under the doctrine of "dual jurisdiction" on the basis that Blake's motion to dismiss was frivolous. *See United States v. Montgomery*, 262 F.3d 233, 240 (4th Cir. 2001). Blake eventually filed another notice of appeal after final judgment was issued against him. We later consolidated the two appeals.

18 U.S.C.A. § 5032. Section 5031 states:

> For the purposes of this chapter, a "juvenile" is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday, and "juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult or a violation by such a person of section 922(x).

18 U.S.C.A. § 5031 (West 2000).

Blake was born on June 1, 1985, and, consequently, was 17 on September 19, 2002, the date of the carjacking. Blake therefore clearly committed an act of "juvenile delinquency" as that term is defined in § 5301 because he violated a federal law before he turned 18 that would have been a crime if committed by an adult. He turned 21 on June 1, 2006, and was indicted almost three months later, on August 31, 2006. The primary question here is whether Blake was a "juvenile" as that term is defined in § 5301. The district court correctly concluded that he was not.

Blake certainly was neither a person who "has not attained his eighteenth birthday" nor a person who "has not attained his twenty-first birthday" at any time during the proceedings in this case. Thus, for us to conclude that Blake qualified as a "juvenile," we would have to read "a person who has not attained his eighteenth birthday" in § 5301 to mean a person who *had* not attained his eighteenth birthday *at the time he allegedly violated the law in question*. That simply is not what the statute says. *See United States v. Wright*, 540 F.3d 833, 838-39 (8th Cir. 2008) (holding that JDA did not apply because defendant "was indicted when he was 28 years old, and was thus no longer 'juvenile'"), *cert. denied*, *Wright v.*

*United States*, 2009 WL 1361579 (U.S. May 18, 2009); *United States v. Hoo*, 825 F.2d 667, 669-70 (2d Cir. 1987) (holding that JDA does not apply to persons who are over the age of 21 when charged); *In re Martin*, 788 F.2d 696, 697-98 (11th Cir. 1986) (per curiam) (holding that JDA did not apply to defendant who committed alleged acts when he was seventeen but was not indicted until he was 24); *United States v. Araiza-Valdez*, 713 F.2d 430, 433 (9th Cir. 1980) (per curiam) (holding that "an information alleging acts of delinquency occurring prior to the accused's 18th birthday but filed after his or her 21st year is too late to establish JDA jurisdiction").[7]

Blake advances two arguments against the district court's interpretation that merit discussion.

First, Blake asserts that unless § 5031 is construed to mean that any person who *had* not attained his eighteenth birthday *at the time he allegedly violated the law in question* is a "juvenile," it will render surplusage the portion of the statutory definition of "juvenile" referring to "a person who has not attained his eighteenth birthday" because anyone who is younger than 18 would necessarily also be younger than 21 at that time. Even if Blake is correct on this point, because the construction that Blake suggests would avoid the surplusage is not plausible for the reason we have already explained, the surplusage argument is of no help to him. *See Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (adopting construction that leads to surplusage because there is "no other reasonable reading of the statute").[8]

---

[7]Blake relies on *United States v. Ceja-Prado*, 333 F.3d 1046 (9th Cir. 2003), but that case is of little assistance. Although the *Ceja-Prado* court concluded that the defendant therein was a juvenile for § 5301 purposes if he was younger than 18 at the time he committed his crime, *see id.* at 1048, 1051, the court did not give any reason for that reading of the statute. Moreover, the defendant there was indicted before he turned 21.

[8]The surplusage simply appears to be the result of a poorly drafted 1974 amendment. Prior to the amendment, 18 U.S.C. § 5031 stated: "For the purposes of this chapter, a 'juvenile' is a person who has not attained his eighteenth birthday, and 'juvenile delinquency' is the violation of a law of the United States committed by a juvenile and not punishable by death or life imprisonment." 18 U.S.C. § 5031 (1970).

Blake also contends that the district court's construction is illogical because it would allow a prosecutor to intentionally deprive a defendant of his rights under the Act by delaying initiating a prosecution against him—perhaps for many years—until he turned 21. But prosecutors in our legal system are granted great discretion to make many important decisions, including whom to charge and what offense to charge. *See, e.g.*, *Ball v. United States*, 470 U.S. 856, 859 (1985); *Hoo*, 825 F.2d at 670-71. They certainly could wreak great havoc under all sorts of scenarios if they chose to abuse the vast authority given to them. *See Hoo*, 825 F.2d at 671. Thus, we do not believe that the possibility that the district court's construction would allow unscrupulous prosecutors to cause unfair results strongly indicates that Congress did not intend the statute's words to be given their plain meaning.[9]

Because the district court correctly denied the motion to dismiss the indictment, any error in denying Blake's request for leave to file an interlocutory appeal was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

## IV.

Blake next contends that the district court abused its discretion in denying his motion for a mistrial based on conduct of the prosecutor during opening statements. Blake complains that the government included too much argument in its opening statement and that an overhead projection sheet employed the phrase "predatory conduct" in relation to Blake. Blake

---

[9]Moreover, statutes of limitations could thwart unfair delays, as perhaps could the Constitution, *cf. United States v. Marion*, 404 U.S. 307, 322-24 (1971) (noting government's concession that Due Process Clause requires the dismissal of an indictment because of a pre-indictment delay when the delay caused "substantial prejudice" to the defendant's rights to a fair trial and the delay was an "intentional device to gain tactical advantage over the accused").

also complains that the prosecutor stated, "if someone were to call you up and say, hey, your brother was just killed because somebody took his car for a ride, for a 20 minute ride, that's just ridiculous," and noted that Blake left his "part of town" in search of a victim. J.A. 1038, 1048. Blake argues that "[t]his was a clear suggestion that [Blake], an African American youth, did not belong in the affluent neighborhood of the Caucasian victim." Appellant's br. at 61-62. We conclude that these actions and statements were not nearly sufficient to warrant a mistrial, let alone a holding that the district court abused its discretion in denying a mistrial. *See United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997) (stating standard of review).

V.

Blake further argues that the district court erred in allowing the government to present evidence relating to his polygraph. We review a district court's decision concerning admissibility of evidence for an abuse of discretion, which we will not find unless the decision was "arbitrary and irrational." *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002). We find no abuse of discretion here.

Polygraph results are generally inadmissible. *See United States v. Brevard*, 739 F.2d 180, 182 (4th Cir. 1984). However, "testimony concerning a polygraph examination is admissible where it is not offered to prove the truth of the polygraph result, but instead is offered for a limited purpose such as rebutting a defendant's assertion that his confession was coerced." *United States v. Allard*, 464 F.3d 529, 534 (5th Cir. 2006) (collecting cases); *cf. United States v. Mohr*, 318 F.3d 613, 626 (4th Cir. 2003) (holding that district court was within its discretion in permitting witness to explain, on redirect examination, that it was his concern over an impending polygraph that caused him to make a written statement when defendant had opened the door for such testimony by suggesting, on cross-examination, other possible, improper motives).

As we have explained, Blake made some of his October 26 admissions to Corporal White as part of a polygraph examination. Before taking the polygraph, Blake had claimed that he had merely been with Tolbert on the night of the carjacking and did not know he was going to rob anyone. Following the examination, White told Blake he appeared to have been deceptive and asked Blake if he was withholding any information. Only then did Blake admit that he had known Tolbert had a gun, that he and Tolbert had been searching for someone to carjack, and that it was Blake who first saw Griffin and pointed him out to Tolbert.

Before trial, the government had stated that it did not intend to make any reference to the polygraph. The government nonetheless filed a motion *in limine* requesting that the district court rule that if Blake argued to the jury that the fact that White interviewed Blake one-on-one indicated that the resulting statements were coerced, the government could introduce evidence of the polygraph to explain why Corporal White interviewed Blake by himself. The court denied the motion.

In the government's opening statement, the prosecutor mentioned that White conducted a one-on-one interrogation of Blake:

> Mr. Blake agrees, as does his mother, agrees to be interviewed by the Maryland State Police, by a detective, corporal who basically specializes in one-on-one interviews. And the idea is to make the witness comfortable or the person they interview comfortable and just ask him what happened which, by the way, is all Detective Johns asked him.

J.A. 1062. In Blake's opening, defense counsel then strongly suggested that the reason for the one-on-one interrogation was to coerce Blake:

> They don't get a lawyer for him. They don't call the Public Defender's office, they have an on-duty per-

son. You want to talk to this young man before we speak to him? They do what they want. They now interview him.

They don't call his mother, who is a mile and a half away, and say, we have a juvenile, your son, here. Do you mind coming in and being with us while we interrogate your son? They don't want his mother there. They don't want a lawyer there. They want a statement from a scared kid, and they get one.

And when they get one, it's not enough. Mr. Blake says, I was there but I didn't do anything. Mr. Tolbert shot this man, Mr. Tolbert drove over his body, Mr. Tolbert had this gun. They don't have enough.

And then you hear about [from the prosecutor] that they decide to do this special one-on-one interrogation with a different detective. I like that term. [The prosecutor] said this detective who specializes in one-on-one interrogation.

Well, see, earlier, interrogation was Detective Johns and Detective Hannon. You had two, which is how the police normally do it. But here, we're going to get you one-on-one with this special detective, who specializes in one-on-one interrogation.

Lo and behold, after this one-on-one interrogation, they now have Mr. Blake saying, I pointed him out, I pointed the man out, and I knew we were going to rob someone, after the special one-on-one interrogation.

You begin to ask yourself, and through trial you will hear the evidence, you start deliberating, that's what you find to be a statement you want to rely upon.

See, its not just the fact that they have a statement. You, the jury, decide whether you rely on that statement and what validity, what weight you give it, if any.

This is not just about getting a conviction. The government may think that but that's not what it's about. It's about you reviewing the evidence and deciding whether this evidence proves to you that Mr. Blake is guilty and that you can rely on this statement, this draconian way of getting it.

J.A. 1078-80.

The government subsequently alerted the court that Blake had argued, in precisely the manner that its motion *in limine* had anticipated, that White's one-on-one interview was coercive. The court agreed that defense counsel had opened the door to evidence about the polygraph and thus the court left "it to the government to make the determination as to how [the issue was] going to be presented." J.A. 1451. Thus, on direct examination, Detective Johns testified that White had administered a polygraph and that afterwards Blake told him that he had admitted to Corporal White that it was he (Blake) who had identified Griffin and pointed him out to Tolbert and that Blake and Tolbert had been looking for a car to steal on the day of the crime. Prior to defense counsel's cross-examination of Detective Johns, the court instructed the jury that it could not speculate regarding the test results and could consider evidence of the polygraph examination only for the purpose of considering the circumstances under which Blake made his statements.

In examining Corporal White about the polygraph, the prosecutor stated to White, in front of the jury, "Now, you understand in no fashion are we to talk about the results of the" polygraph. J.A. 1910. The prosecutor then asked a few questions about what questions White asked during the test.

Defense counsel objected and, during a side bar, argued that the government's questions were beyond the scope allowed. The court sustained that objection "to any further questions with respect to the specifics of the polygraph." J.A. 1911. Defense counsel also argued that the government's statement to White that he should not discuss the polygraph results was improper and prejudicial in that it would cause the jury to conclude that Blake failed the polygraph. Defense counsel reasserted its earlier request for a mistrial. The court denied the motion, concluding the jury had not heard enough to determine that Blake failed the polygraph.

Blake contends that the district court erred in ruling that he opened the door to testimony concerning the polygraph and argues that even if he did open the door, the polygraph evidence should have been excluded under Rule 403 because "its probative value [was] substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. We find no error.

First, we hold that the court's initial ruling that defense counsel opened the door to questioning about the polygraph was clearly within the district court's discretion. Defense counsel unmistakably advanced the argument that the one-on-one nature of Cpl. White's interrogation was a coercive police tactic that should undermine confidence in the truth of Blake's statement. To allow such an attack to go unanswered would have been unfair. *See Allard*, 464 F.3d at 534. Blake argues that it was the government that first mentioned the fact that the interrogation was one-on-one and that defense counsel's argument was merely a response to that argument. But whether the government mentioned the one-on-one nature of the interrogation is of no moment because there was no reason that defense counsel needed to comment on that fact. It was, of course, only defense counsel who suggested that the interrogation was coercive. The district court therefore properly ruled that defense counsel opened the door to questioning about whether the one-on-one interrogation was in the context of a polygraph.

As for whether the evidence's probative value was substantially outweighed by the danger of unfair prejudice, the district court was within its discretion in ruling that it was not. The evidence had substantial probative value, for the reason we have discussed. Any danger of unfair prejudice was greatly minimized by the court's instructions. And, in any event, even if the evidence was prejudicial, the prejudice to Blake was hardly "unfair" as it was Blake himself who essentially forced the court to admit the evidence.

## VI.

Blake next claims that the district court erred in allowing the government to call a witness, Kenyah Carroll, without allowing a delay to later in the trial, as Blake had requested. We disagree.

Carroll was a former girlfriend of Blake's to whom Blake admitted, among other things, that on the day of his crime, he and Tolbert had intended to commit a carjacking and that it was Blake who initially saw Griffin and pointed him out to Tolbert. Defense counsel had received and reviewed the transcript of Carroll's grand jury testimony at least five days before the trial began.[10]

At the beginning of the trial day on June 14, 2007, the government informed the defense that it intended to call Carroll in addition to the other witnesses about whom it had notified the defense the day before. The government represented that she was young and scared and it had decided to call her in order to end her ordeal as quickly as possible. Defense counsel responded that he was not prepared to cross-examine Carroll and requested that the court prohibit her from being called at that time. The government represented that it had attempted to notify defense counsel the night before that Carroll would

---

[10]The government maintained that it had produced the transcript to Blake at least three weeks prior to trial.

be called. It also provided the court with a proffer of her expected testimony and informed the court that direct examination would likely not exceed one hour. Defense counsel requested that at the very least, Carroll be called after lunch so that he could have at least the lunch break to prepare. The court overruled defense counsel's objection, however, and allowed Carroll to be called immediately.

Federal Rule of Evidence 611(a) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." The rule gives the trial judge broad discretion, and accordingly, "in applying the rule, a judge's ruling will not be the basis for reversal of a criminal conviction unless a defendant's substantial rights are affected." *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991) (internal quotation marks omitted).

The district court acted within its discretion. The subject-matter of Carroll's testimony was not complex, and, notwithstanding Blake's claim that he was not prepared to cross-examine Carroll, the record reflects that his cross-examination was quite effective. He elicited testimony that she was unclear about when Blake made the statement to her, that she did not tell the government about Blake's statement until after she and Blake had a bad breakup, that she had earlier stated that Blake told her that "they" rather than "he" first saw the victim, J.A. 1483-84, and that Blake told her that Tolbert shot the victim. Counsel also elicited testimony that Blake told Carroll that he was not aware that Tolbert had a gun, that Blake told her that Tolbert took the keys out of the victim's pocket, that Blake told her Tolbert drove the victim's vehicle, that Blake did not frequent Elvaton (where Blake and Tolbert went after the shooting), and that she had never seen Blake with a gun. Blake has not begun to show how his substantial rights were

affected. In fact, he has not suggested anything that counsel would have done differently had he been given more time to prepare.

## VII.

Blake next argues that the district court abused its discretion in excluding a particular hearsay statement from evidence. We disagree.

During the trial, Blake sought to call a witness named Steven Queen. In an interview conducted in December 2003, Queen had stated that during his incarceration with Tolbert, he overheard Tolbert speaking to a person that Queen did not know. Queen stated that Tolbert said Tolbert and Blake followed the victim home to rob him of his car, that Tolbert approached the man and pointed a gun at him, demanding his wallet and keys, and that the victim complied. According to Queen, Tolbert stated that he (Tolbert) then got into the victim's car, as did Blake, and that the victim then asked Tolbert not to take his truck, at which time Tolbert got out of the vehicle and shot the victim. Queen stated that Tolbert said he then got back into the car's passenger seat, pointed the gun at Blake, and ordered Blake to drive, threatening to shoot him if he refused.

Blake sought to admit Queen's testimony pursuant to Rule 804(b)(3), which provides, in pertinent part:

> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> **(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest,

or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused *is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Fed. R. Evid. 804(b)(3) (third emphasis added).

The government moved *in limine* to exclude the testimony on the basis that it did not satisfy the requirement that there be corroborating circumstances clearly indicating the trustworthiness of the statement. The district court excluded the statement, finding that it had an "inherent lack of reliability for the truth of it" and that it was "a typical jailhouse type of an exchange and it does lack sufficient corroboration to warrant its admission." J.A. 2053. Blake now challenges the ruling on appeal.

Rule 804(b)(3) places a "formidable burden" on those seeking to offer evidence pursuant to that rule. *United States v. MacDonald*, 688 F.2d 224, 233 (4th Cir. 1982). The district court's findings regarding the guarantees of trustworthiness of a statement offered pursuant to Rule 804(b)(3) are reviewed for clear error. *See United States v. Workman*, 860 F.2d 140, 144 (4th Cir. 1988). We review the court's decision to admit or exclude the evidence for abuse of discretion. *See United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995).

The exclusion of Queen's statement was well within the district court's discretion. As the district court concluded, other than Queen's account, there was no evidence corroborating even the fact that Tolbert made the statement, much less any evidence that Tolbert's statement was trustworthy. Not only did Blake not produce evidence of any other instance of Tolbert admitting to be the triggerman, evidence

was presented that Tolbert had repeatedly denied being the triggerman. Moreover, other aspects of the statement itself also reduced its trustworthiness. For example, Queen claimed that Tolbert said that Tolbert and Blake had followed that victim home, but Blake conceded at trial that they had not done so. Also, Queen claimed that Tolbert took the victim's wallet, when in fact the wallet was found on the victim's person. The circumstances of the statement as described by Queen further support the district court's finding of unreliability. The statements were said to have been made in a prison yard to a person whose relationship to Tolbert is unknown. Certainly, prisoners, for many reasons, often tend to exaggerate, boast, or posture in their day-to-day interactions. *See United States v. Seabolt*, 958 F.2d 231, 233 (8th Cir. 1992) (per curiam). There is no reason not to believe that this was simply one of those occasions.

## VIII.

Blake also maintains that the district court erred in instructing the jury regarding the death element of the carjacking offense. We find no reversible error.

"When confronted by a claim of an erroneous jury instruction, we do not conduct a search for technical error. Rather, our inquiry is whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 788-89 (4th Cir. 1990).

The statute provides, in relevant part:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—

(1) be fined under this title or imprisoned not more than 15 years, or both,

. . . .

(3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C.A. § 2119.

To obtain a conviction under § 2119(1), the government must prove that the defendant "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *United States v. Foster*, 507 F.3d 233, 246 (4th Cir. 2007) (internal quotation marks omitted). To establish guilt under § 2119(3), the government must also prove the additional element that "death result[ed]" from the defendant's taking or attempted taking of the vehicle. 18 U.S.C.A. § 2119(3); *Jones v. United States*, 526 U.S. 227, 251-52 (1999) (holding that provisions of § 2119 setting higher penalties when the offense involves serious injury or death establish elements of separate offenses, not mere sentencing factors).

The relevant instruction was as follows:

If you find that the government has proved the four elements of the charged carjacking crime that I have just described beyond a reasonable doubt, you will be asked to record on your verdict form whether you find beyond a reasonable doubt that the death of Straughan Lee Griffin *resulted from the carjacking*.

The government does not have to prove that the death occurred during the actual carjacking. It's suf-

> ficient if the government proves the defendant caused the death of Straughan Lee Griffin at any time during the carjacking or the defendant's retention of the vehicle.

J.A. 2311 (emphasis added).

Blake contends that the district court was required to instruct the jury both that it must determine whether the government proved beyond a reasonable doubt that Blake's actions caused the victim's death and that that fact is an element of the crime of carjacking resulting in death. Blake argues that the instruction was deficient in two ways. First, it stated that the jury need only find that death resulted from the carjacking (as opposed to finding that Blake's actions caused the death). Second, although the instruction conveyed that the jury had to determine whether the government proved that fact beyond a reasonable doubt, it did not convey that that fact was an element of the offense of carjacking resulting in death (as opposed to a sentencing factor or some other type of fact).

We conclude that the district court's instruction fairly conveyed the controlling law. The instruction properly reflected that a defendant commits a § 2119(3) offense whenever death results from his violation of § 2119(1). It also properly conveyed that, in order to obtain a conviction, the government must prove that death resulted from the carjacking *beyond a reasonable doubt*. The fact that the death element is an offense element rather than simply a factor that would affect Blake's sentence was a mere technicality that was of no concern to the jury and that had no effect on its deliberations. Thus, it is not a basis for reversal.[11]

---

[11]Blake also contends that the district court failed to observe the requirements of Rule 30, which provides that "[o]pportunity shall be given to make the objection [to the charge] out of the hearing of the jury and, on request, out of the jury's presence." Fed. R. Crim. P. 30. However, as Blake concedes, violation of that rule is not grounds for a new trial if it affirmatively appears that no prejudice resulted. *See United States v. Buie*, 538 F.2d 545, 546 (4th Cir. 1976). Here, because the charge correctly instructed the jury regarding the issue it was required to resolve, no prejudice resulted from any violation, and Blake is not entitled to relief.

IX.

Blake finally challenges his sentence. He argues that his sentence was procedurally unreasonable because the district court erred in determining his advisory sentencing guidelines range. Specifically, he maintains that the court erred in refusing to grant him a two- or four-level offense-level reduction for being a minor or minimal participant, *see* U.S.S.G. § 3B1.2, when the evidence demonstrated that Tolbert controlled the gun, pulled the trigger, and drove the vehicle away. We find no clear error.[12] *See United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) (stating standard of review).

The commentary to § 3B1.2 explains that role adjustments are for defendants who are "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 (cmt. (n.3(A)). In determining whether the adjustment applies, we consider not only "the defendant's conduct relative to the other defendants, but also . . . his or her conduct relative to the elements of conviction." *United States v. Akinkoye*, 185 F.3d 192, 202 (4th Cir. 1999). In so doing, we consider "whether the defendant's conduct is material or essential to committing the offense." *Id.* (internal quotation marks omitted).

Regardless of whether Blake actually controlled the gun, pulled the trigger, or drove the car, he comprised one half of an armed two-person carjacking team. Indeed, he was the person who pointed Griffin out and suggested to Tolbert that they rob him. In light of these facts, the district court certainly did not clearly err in declining to reduce Blake's offense level for being a minor or minimal participant.

---

[12]Blake also maintains that the district court did not adequately and properly consider the § 3553(a) sentencing factors. However, the district court in fact explicitly considered the § 3553(a) factors.

## X.

In sum, for the foregoing reasons, we affirm Blake's conviction and sentence.

*AFFIRMED*