**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**No. 15-4573**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ALEXSI LOPEZ, a/k/a Alexis Lopez,

        Defendant - Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:12-cr-00075-PWG-2)

---

Argued:  January 26, 2017                     Decided:  June 19, 2017

---

Before MOTZ, KING, and HARRIS, Circuit Judges.

---

Affirmed by published opinion.  Judge Harris wrote the opinion, in which Judge Motz and Judge King joined.

---

**ARGUED**: Carmen D. Hernandez, LAW OFFICES OF CARMEN D. HERNANDEZ, Highland, Maryland, for Appellant. Amanda Brooke Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

_____

PAMELA HARRIS, Circuit Judge:

In 2007, two young men robbed a brothel in Langley Park, Maryland, raping one victim and killing another. Several years later, DNA testing identified appellant Alexsi Lopez as a suspect, and Lopez was indicted in 2013, more than six years after the crime. Though Lopez was 17 years old at the time of the robbery, he was over 21 when indicted, and thus tried as an adult. A jury convicted Lopez of two counts under the Hobbs Act, 18 U.S.C. § 1951(a), the federal robbery statute.

The gap of over six years between crime and indictment is the primary focus of Lopez's appeal. Lopez argues, first, that because he was under 18 when the robbery was committed, he should have been tried as a juvenile notwithstanding the passage of time before his indictment, and that to the extent the Juvenile Delinquency Act, 18 U.S.C. § 5031, provides otherwise, it is unconstitutional. Lopez also argues that his prosecution was untimely under the ordinary five-year statute of limitations for a Hobbs Act robbery, and that 18 U.S.C. § 3297, which extends the limitations period in certain cases involving DNA testing, does not apply. And third, Lopez claims that the government violated his due process rights by delaying his indictment without justification.

We agree with the district court that Lopez's timing-related arguments are without merit. We also agree that the government established the connection to interstate commerce necessary to sustain a Hobbs Act conviction. And we find no error in the evidentiary rulings challenged on appeal, or in Lopez's sentencing. Accordingly, we affirm.

3

# I.

## A.

The Langley Park area of Prince George's County, Maryland, includes several apartment complexes that house illegal businesses, including a network of brothels. Because those businesses are illegal, they are frequent targets of La Mara Salvatrucha, a gang, better known as MS-13; among other things, MS-13 seeks to impose weekly "rent" charges on these underground establishments.

The events giving rise to this case occurred at a Langley Park brothel on February 28, 2007. The brothel, located in a first-floor apartment, was staffed on that day by two workers: Adelaida Garcia-Calderon, who regularly traveled from her home in New York to work as a prostitute; and a doorman, who collected money from customers. Two men entered the apartment and demanded money. After tying the doorman's hands and feet with the electric cord of a fan, they searched the apartment. One of the intruders, brandishing a knife, forced Garcia-Calderon into a bedroom, and then raped her at knife-point. Although the man placed a pillow over much of Garcia-Calderon's face, Garcia-Calderon was able to see the sheath of the knife on a table by the bed.

While Garcia-Calderon was in the bedroom, a man named Carlos Cordon inadvertently walked in on the robbery, and began to yell and plead with the man in the living room not to harm him. When Cordon would not "shut up" as instructed, the

4

assailant repeatedly stabbed him. J.A. 110.[1] Cordon, whose body was discovered the next day behind the apartment building, died as a result of multiple sharp force injuries. Garcia-Calderon and the doorman survived the robbery: After the intruders left the premises, Garcia-Calderon untied the doorman and then, shocked and frightened, escaped through a window in the apartment.

The Prince George's County Police Department ("PGCPD") directed the ensuing investigation. Garcia-Calderon was unable to identify either robber, including her rapist. But state investigators collected over 40 pieces of physical evidence from the crime scene, including the knife sheath from the table next to the bed where Garcia-Calderon was raped. Because the PGCPD did not have a DNA lab in operation at the time, it out-sourced DNA testing to a private lab in Baltimore; and in light of the costs of private testing, the PGCPD followed a "triage process," J.A. 571, under which it conserved resources by first sending only the five most important items to be tested. Although the five items selected by investigators did not initially return any results, in September of 2011, the PGCPD was informed that the DNA of Miguel Ramon Cerros-Cruz, an MS-13 member, was found on the electric cords used to bind the doorman during the 2007 robbery.

The knife sheath was submitted for DNA testing with a second round of evidence in November of 2011. On April 23, 2012, the federal Combined DNA Index System (CODIS) matched the DNA found on the knife sheath to Lopez. Based on that finding,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal, and citations to the "S.A." refer to the Supplemental Joint Appendix.

5

the PGCPD secured a warrant to collect a DNA sample from Lopez, and on June 27, 2012, after performing its own analysis, the PGCPD lab concluded that the DNA on the knife sheath matched the sample taken from Lopez.

Having identified Lopez as a suspect, the PGCPD investigated further to confirm Lopez's involvement in the robbery. In May 2013, it secured the testimony of a confidential informant, a member of MS-13 serving a prison sentence. In late 2007, the informant overheard Lopez – then incarcerated in the same facility – tell another inmate that he and Cerros-Cruz had robbed a brothel and killed a man who refused to cooperate.

With this additional information in hand, the government formally charged Lopez, and on July 15, 2013, more than six years after the robbery, a grand jury indicted both Lopez and Cerros-Cruz for one count of conspiracy to commit Hobbs Act robbery and one count of Hobbs Act robbery. *See* 18 U.S.C. § 1951. Cerros-Cruz entered into a plea agreement on the conspiracy count, and in return, the government dismissed the robbery count against him. As agreed upon by the parties, Cerros-Cruz was sentenced to ten years' imprisonment.

Lopez elected to go to trial. Under the Juvenile Delinquency Act, which removes juveniles from the adult criminal justice system, the government generally may not try a juvenile in federal court. 18 U.S.C. § 5032. But because Lopez, 17 at the time of the crime, was 24 when he was indicted six years later, the government proceeded against him as an adult and in federal court.

**B.**

**1.**

Before trial, Lopez moved to dismiss the indictment against him, arguing that the Juvenile Delinquency Act ("JDA" or "Act") prohibited the government from initiating proceedings in federal court. And to the extent that the JDA does not treat him as a juvenile, Lopez contended, the Act is unconstitutional under the due process and equal protection components of the Fifth Amendment as well as the Eighth Amendment. The district court denied Lopez's motion. Relying on *United States v. Blake*, 571 F.3d 331 (4th Cir. 2009), the court held that under the plain language of the JDA, "if charges are brought against the defendant . . . [when] he is 21 or older, even if the conduct [was] committed as a juvenile," the prosecution falls outside the scope of the statute. J.A. 42. The court then rejected Lopez's constitutional challenge to the JDA so construed, noting that other courts have rejected similar challenges and that no authority supported Lopez's position.

Lopez also moved to dismiss based on pre-indictment delay, raising two distinct claims. First, he maintained that the charges against him, filed more than six years after the offense, were barred by the five-year statute of limitations that applies to the Hobbs Act. The district court rejected that claim, relying on 18 U.S.C. § 3297, which restarts an otherwise applicable limitations period if "DNA testing implicates an identified person in the commission of a felony." S.A. 77–78 (quoting 18 U.S.C. § 3297). Because Lopez was not "implicate[d]" until 2012, when DNA results on the knife sheath were returned,

7

the court reasoned, the government was well within the new five-year limitations period when it charged Lopez in 2013.

Lopez's second claim – that over six years of pre-indictment delay violated his due process rights – fared no better. In denying Lopez's pre-trial motion to dismiss, the district court assumed for the sake of argument that Lopez could show the necessary prejudice arising from the delay. But because the delay was not caused by government misconduct and instead was justified by the government's continued investigation, the court held, Lopez could not make the second required showing: that "the reason for the delay violates . . . fundamental concepts of justice, fair play, and decency." S.A. 107 (citing *United States v. Williams*, 684 F.2d 296, 302 (4th Cir. 1982)). When it revisited Lopez's due process claim at the end of the trial, the district court amended its reasoning, finding this time that Lopez in fact could not make the "threshold showing" of prejudice necessary to sustain his claim. J.A. 768.

## 2.

The case proceeded to trial, where one of the government's key witnesses was the confidential informant who had been incarcerated with Lopez in 2007. The informant told the jury about the conversation he overheard between his cellmate, an MS-13 gang member, and Lopez, in which Lopez boasted about committing a robbery and murder at a brothel. He also testified that the MS-13 gang enforced strict rules against its members, and treated cooperation with law enforcement as punishable by death.

The government also introduced the DNA evidence linking Lopez to the knife sheath recovered from the bedroom. Lopez moved to strike the evidence, on the ground

that a stain on the bag containing the sheath could have contaminated the DNA sample. But the DNA lab analyst testified that the stain did not affect testing, as the interior of the bag had not been compromised. The district court admitted the evidence conditionally, instructing the jury to consider the evidence only if it found that the DNA had not been contaminated so as to influence the results of the analysis.

In his closing argument, Lopez took on the testimony of the government's confidential informant, and questioned why the government had not called the informant's cellmate as a witness, in order to corroborate the testimony. The government responded in its rebuttal argument, explaining that alerting the MS-13 cellmate would have placed the informant in danger and reminding the jury that "MS-13 retaliates" against those who cooperate with law enforcement. S.A. 261. Lopez did not object. At the conclusion of closing arguments, the jury began deliberations, and the next day returned with a guilty verdict.

**3.**

Following the verdict, Lopez filed a motion for a new trial or for a judgment of acquittal notwithstanding the jury's verdict. As primary grounds for an acquittal, Lopez argued that the government failed to present sufficient evidence that the robbery interfered with interstate commerce, as required for a conviction under the federal Hobbs Act. The district court disagreed. Analogizing to *United States v. Taylor*, 754 F.3d 217, 224 (4th Cir. 2014), in which we held that robbery of an illegal drug enterprise run from a private home satisfies the jurisdictional predicate of the Hobbs Act, the court reasoned

9

that robbery of a brothel is "no different," as both drug dealing and prostitution are "inherently economic" activities that "affect[] interstate commerce." J.A. 779.

The court also rejected Lopez's arguments for a new trial. Lopez claimed, first, that the government had improperly bolstered or vouched for its witness when it explained during rebuttal why it did not interview the cellmate of its confidential informant. But the government's closing argument regarding the risk of MS-13 retaliation, the court held, did not go beyond the evidence presented at trial; and, in any event, even had the comments been improper, Lopez had not shown sufficient prejudice to warrant a new trial. Nor, the court held, was there any merit to Lopez's claim that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), with respect to evidence regarding the stain on the bag holding the knife sheath, as the government in fact had disclosed information about the stain to the defense. After considering all of Lopez's arguments, the district court denied Lopez's post-trial motion.

At sentencing, in applying the § 3553(a) factors, the district court emphasized as a "very important fact," J.A. 849, that Lopez "was very young at the time that this offense took place," J.A. 858. But given the violent nature of the murder and rape, the obligation to provide just punishment, and the need for deterrence, the court sentenced Lopez to 20 years' imprisonment. Although Lopez stressed that his co-perpetrator Cerros-Cruz was sentenced to only ten years after pleading guilty, the court rejected that juxtaposition as "comparing apples to oranges": There is no requirement, the court explained, that "a defendant who goes to trial" be given the same sentence as "a person who pleaded guilty." J.A. 857.

10

Lopez timely appealed.

## II.

Lopez's appeal focuses primarily on the six-year delay between the 2007 robbery and his 2013 indictment, and the consequences of the delay for these proceedings. Because of the delay, Lopez argues, he was tried as an adult and not as a juvenile, and the provision of the Juvenile Delinquency Act authorizing that outcome is unconstitutional. Lopez also renews his claims that his 2013 prosecution is outside the statute of limitations and that the delay in charging him violates his due process rights. We review the legal questions raised by these contentions de novo, and the district court's associated factual findings for clear error. *See United States v. Brehm*, 691 F.3d 547, 550 (4th Cir. 2012). As explained below, we affirm.

## A.

The Juvenile Delinquency Act removes juvenile offenders from the ordinary criminal justice process and puts them in a separate, age-appropriate system focused on treatment and rehabilitation. *See Blake*, 571 F.3d at 344 (describing JDA). Those safeguards apply only to the prosecution of a "juvenile," a term defined in § 5031 of the Act:

> For the purposes of this chapter, a "juvenile" is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday[.]

11

18 U.S.C. § 5031. As the district court recognized, this court held in *Blake* that a defendant like Lopez, who is under 18 at the time of an offense but 21 years or older when indicted, does not qualify as a "juvenile" under the plain terms of § 5031. *See* 571 F.3d at 344–45. To conclude otherwise, this court reasoned, "we would have to read 'a person who has not attained his eighteenth birthday' [] to mean a person who *had* not attained his eighteenth birthday *at the time he allegedly violated the law in question.* That simply is not what the statute says." *Id.* at 344 (emphasis in original) (quoting 18 U.S.C. § 5031).

On appeal, Lopez does not argue that he qualifies as a "juvenile" under § 5031. Instead, he renews his challenges to § 5031 on constitutional grounds. The thrust of Lopez's argument is that excluding from the JDA those who turn 21 only after they commit offenses but before they are indicted is arbitrary and irrational. According to Lopez, juveniles are singled out for protection by the JDA because of their reduced moral culpability for bad acts committed before they become adults. And if the point of the JDA is culpability at the time of the offense, then it makes no sense to strip protection from the subset of juvenile offenders who happen to be charged after their twenty-first birthdays. Because § 5031's definition "arbitrarily eliminate[s]" the Act's benefits for offenders who are no more morally culpable than those who remain covered, Lopez

12

argues, it bears no rational relationship to the JDA's purported end and thus fails to comport with the Constitution. Br. of Appellant at 20.[2]

The problem with Lopez's argument is that its premise is false: The JDA is not concerned exclusively, or even primarily, with the moral culpability of offenders at the time of their crimes. Rather, the JDA is intended to ensure that at the time they are brought into the criminal justice process, juveniles will have the benefit of a system that is tailored to their special needs and vulnerabilities and, in particular, to their special receptivity to rehabilitation. *See United States v. Juvenile Male*, 554 F.3d 456, 459 (4th Cir. 2009) (purpose of JDA is "to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation") (internal quotation marks omitted). It is because juveniles are "presumptively capable of rehabilitation," that is, that they are made subject to the JDA and its underlying "rehabilitative philosophy." *United States v. Juvenile*, 347 F.3d 778, 785 (9th Cir. 2003). Thus, the statute's "remedial scheme" focuses primarily on "the offender's *current* prospects for rehabilitation . . . and only secondarily on the offender's age at the time of the alleged offense." *United States v. Welch*, 15 F.3d 1202, 1206–07 n.4 (1st Cir. 1993) (emphasis in original).

In light of this statutory purpose, it is entirely rational to define as juveniles protected by the JDA only those who are younger than 21 when they are indicted,

_____

[2] Lopez also argues for application of strict scrutiny to § 5031's operation. But there is no fundamental right to be tried as a juvenile, *see United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000) (rejecting constitutional challenge to operation of JDA), nor any other basis for subjecting § 5031 to heightened scrutiny.

13

regardless of the age at which they are alleged to have committed their offenses. What matters under the JDA is whether a defendant will benefit from a separate delinquency system that is specially geared toward the needs and the unique rehabilitative capacity of juveniles. And the answer to that question will depend on the age of the defendant at the time he or she is brought into the criminal justice process. Thus, there is nothing irrational about Congress's decision, codified in § 5031, to reserve the protections of the juvenile justice system for offenders who enter it before they turn 21.

Lopez fares no better by reframing his argument as a due process claim, contending that § 5031 unconstitutionally deprives him of a hearing on whether he may be tried as an adult. As Lopez observes, cases like *Kent v. United States*, 383 U.S. 541, 553–54 (1966) and *Kemplen v. Maryland*, 428 F.2d 169, 173 (4th Cir. 1970), emphasize the importance of procedural regularity, including a fair hearing, when a juvenile is transferred out of a juvenile system for trial as an adult. But those cases have no application here. Unlike the defendants in *Kent* and *Kemplen*, Lopez never was classified as a "juvenile," subject to the jurisdiction of a juvenile system, and so protections attendant to the removal of a juvenile from a juvenile system are not implicated by his case. And nothing in *Kent* or *Kemplen* suggests that an initial failure to deem an individual a juvenile violates due process, or that a hearing is required before § 5031's age cut-off may be applied.

Instead, we agree with the Second Circuit, which rejected precisely this due process challenge to § 5031 of the JDA in *United States v. Hoo*, 825 F.2d 667 (2d Cir. 1987). Like Lopez, the defendant in *Hoo*, who committed an offense as a juvenile but

14

was charged only after he turned 21, argued that the prosecutor's decision regarding the timing of his indictment should be subject to a hearing akin to the transfer hearing required by *Kent*, given the decision's consequences for his status under the JDA. *See id.* at 670. But as the court explained, unlike the judicial transfer determination in *Kent*, a prosecutor's determination as to when to charge a case "has been rarely subject to judicial review." *Id.* Given prosecutors' broad discretion in the bringing of charges, the court concluded, due process cannot be understood to "require that decisions to prosecute be subjected to pre-indictment judicial inquiry simply because the timing of the decision affects the availability of juvenile procedures." *Id.* at 671. We see no reason to depart from that ruling today.[3]

Finally, there is no merit to Lopez's claim that § 5031 violates the Eighth Amendment's bar on cruel and unusual punishment by disregarding the difference in culpability between juvenile and adult offenders and exposing him to adult punishment for a crime committed as a youth. Although the Supreme Court has held that certain punishments – the death penalty and mandatory life-without-parole sentences – may not be imposed on juvenile offenders in light of diminished culpability, *see Roper v. Simmons*, 543 U.S. 551, 571 (2005) (juvenile death penalty); *Miller v. Alabama*, 132 S. Ct. 2455, 2460 (2012) (juvenile life-without-parole), Lopez's twenty-year sentence does

---

[3] Like the court in *United States v. Hoo,* we need not in this case address whether due process rights might be implicated were the government to delay proceedings improperly in order to deprive a defendant of recourse to the juvenile system. *See* 825 F.2d 667, 671 (2d Cir. 1987) (noting that "appellant has made no showing of an improper prosecutorial motive").

not implicate those limits. And while Lopez argues that cases like *Roper* and *Miller* prohibit a sentencing regime in which judges are unable to give effect to a defendant's youth at the time of his or her offense, § 5031 does not govern sentencing procedures, and the district court here was free to – and did – give careful weight to Lopez's age at the time of the offense under § 3553(a)'s sentencing factors. *See* 18 U.S.C. § 3553(a).

In sum, we agree with the district court that Lopez's constitutional challenge to § 5031 of the JDA is without merit. Accordingly, we affirm the district court's denial of Lopez's motion to dismiss on that ground.

**B.**

Lopez also contends that the six-year gap between the 2007 robbery and his 2013 prosecution runs afoul of the five-year statute of limitations that ordinarily applies to Hobbs Act prosecutions. *See* 18 U.S.C. § 3282(a). The district court rejected that claim, relying on 18 U.S.C. § 3297, which extends the limitations period in certain cases involving DNA testing. We agree with the district court.

Under § 3297, the statute of limitations for a felony effectively restarts if DNA testing "implicates" a person in the crime:

> In a case in which DNA testing implicates an identified person in the commission of a felony, no statute of limitations that would otherwise preclude prosecution of the offense shall preclude such prosecution until a period of time following the implication of the person by DNA testing has elapsed that is equal to the otherwise applicable limitation period.

18 U.S.C. § 3297. The government reasons that Lopez was not "implicate[d]" in the 2007 robbery until 2012, when the DNA on the knife sheath was matched to Lopez. That triggered the start of a new five-year limitations period – a "period of time following the

16

implication . . . equal to the otherwise applicable limitation period," *id.* – only a year of which had elapsed when Lopez was charged in 2013.  The district court agreed, adopting the government's straightforward reading of § 3297.

Lopez, on the other hand, argues that he was "implicate[d]" for purposes of § 3297 as early as March of 2008, when his DNA was first entered into the CODIS database.  According to Lopez, the government *could* have identified him then, had it submitted the knife sheath for DNA testing immediately after the robbery in 2007.  And on that theory, the new five-year limitations period would have expired a few months before Lopez's July 2013 indictment.

Whether § 3297 makes Lopez's prosecution timely, in other words, turns on the point at which "DNA testing implicates" a person for purposes of that statute.  And while our court has not addressed that issue, the Seventh Circuit has, holding in *United States v. Hagler*, 700 F.3d 1091, 1098 (7th Cir. 2012), that "DNA evidence will 'implicate' someone" under § 3297 only when there is a "match[]," generally to a "single, identified person."  While *Hagler* left open the possibility that DNA evidence could "implicate" more than one person for purposes of § 3297, imagining a defendant with an identical twin, *id.* – a scenario we also may leave open for now – it made clear that a person could not be "implicated" under § 3297 until there was, at a minimum, an actual DNA "hit" that would "strongly tie that person to wrongdoing." *Id.* at 1097.

Like the district court, which relied on *Hagler* in its decision, we agree with the Seventh Circuit.  The statutory text is plain:  The new limitations period is triggered when "DNA testing *implicates* an identified person" in a felony, 18 U.S.C. § 3297 (emphasis

17

added), not when it "*could* implicate" a person. There is no language conditioning § 3297's application on the timeliness of a government investigation leading to DNA testing; what matters is only the time at which completed testing "implicates" a suspect. Any other interpretation would require us to add into the statute words that are not there.

This plain reading of § 3297 is confirmed by the statute's legislative history, which describes the provision as intended to "properly toll[] the statute of limitations for crimes with a DNA sample until that sample is *matched to a person. Once the sample is matched to a person*, the statute begins to run." H.R. Rep. No. 108-321(I), at 132 (2003) (emphasis added). Thus, the statute provides prosecutors with "the ability to charge the true perpetrator . . . *whenever* he is accurately identified through DNA." *Id.* at 133 (emphasis added). And it conforms as well to Congress's larger understanding in enacting § 3297, which was that "DNA evidence, unlike most other kinds of evidence, can maintain its reliability for decades," so that the concerns traditionally associated with delayed prosecutions are significantly attenuated. *Hagler*, 700 F.3d at 1098.

In light of the plain text and purpose of § 3297, it is clear that "DNA testing implicate[d]" Lopez only in 2012, when he was linked to the DNA sample taken from the knife sheath. Because Lopez was indicted well within the five-year clock that began to run with the 2012 DNA match, his prosecution was timely under § 3297, and we affirm the district court's denial of Lopez's motion to dismiss on statute of limitations grounds.

## C.

Lopez's final delay-related claim is that the more than six-year gap that elapsed between the 2007 robbery and his 2013 indictment violated his due process rights. In

18

order to prevail on a due process claim based on pre-trial delay, a defendant first must show that he suffered actual prejudice. *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009). If that threshold requirement is met, then a court will consider the government's reasons for the delay, to evaluate whether there has been a violation of "fundamental conceptions of justice or the community's sense of fair play and decency." *Id.* (internal quotation marks omitted); *see Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). The district court held that Lopez could satisfy neither prong of this standard, and again, we agree.

As to prejudice, the district court properly applied circuit case law requiring a showing of "actual substantial prejudice," described as a "heavy burden." *See Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996). After a careful review of the facts of this case, the court concluded that Lopez could not meet that burden by identifying specific witness testimony or evidence that was lost to him as a result of the passage of time. Nor, the district court held in the alternative, had the government unreasonably delayed Lopez's indictment under the second prong of the analysis. Any delay in DNA testing of the knife sheath, the district court found, was attributable to limited resources for private testing and the "triage system" adopted as a consequence. J.A. 769. And once DNA testing implicated Lopez, the court determined, the government reasonably searched for additional evidence and then brought its case to the grand jury as quickly as that evidence – in the form of testimony from a confidential informant – materialized.

We have no reason to second-guess the district court's determination that Lopez failed to establish actual prejudice stemming from pre-trial delay, nor its finding that the

19

time between offense and charge was a result of continued reasonable investigation rather than any government misconduct. Accordingly, we affirm the denial of Lopez's motion to dismiss on this ground, as well.

## III.

We turn now to the district court's denial of Lopez's motion for a new trial or judgment of acquittal. Finding no error in the district court's rulings on Lopez's claims, we affirm.

## A.

Lopez first maintains that the government failed to present sufficient evidence that the robbery of the Langley Park brothel interfered with interstate commerce as required under the Hobbs Act, and that the district court erred in denying his motion for a judgment of acquittal on that ground. We review the district court's denial of Lopez's motion de novo, but we view the evidence in the light most favorable to the prosecution, and will affirm if there is evidence in the record from which a reasonable finder of fact could find the necessary connection to interstate commerce. *See Taylor*, 754 F.3d at 224.

The Hobbs Act criminalizes robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce[.]" 18 U.S.C. § 1951(a). Accordingly, a Hobbs Act violation requires proof of two elements: an underlying robbery or extortion crime, and an effect on interstate commerce. *United States v. Williams*, 342 F.3d 350, 353 (4th Cir. 2003). As we have explained, the jurisdictional predicate of the Hobbs Act requires only a "minimal effect"

20

on interstate commerce – including one "so minor as to be *de minimis*" – and there is no requirement that the effect on commerce be intended, so long as it is a "natural, probable consequence" of the defendant's actions. *Taylor*, 754 F.3d at 222 (internal quotation marks omitted). And we have recognized that because drug dealing, though illegal, is an "inherently economic enterprise that affects interstate commerce," robbery of a drug dealer is the kind of act that satisfies the "affecting commerce" element of a Hobbs Act robbery. *Williams*, 342 F.3d at 355; *see Taylor*, 754 F.3d at 223 ("Drug dealing is a commercial enterprise and robberies of drug dealers threaten that enterprise; that is enough for a federal court to exercise jurisdiction under the Hobbs Act.").

Like the district court, we think the same principle applies here. An illegal brothel "is a commercial establishment that deals in the business of prostitution," J.A. 779 – an "inherently economic enterprise" under *Williams* and *Taylor*. And this particular business, as the district court recognized, was significantly facilitated by interstate commerce, as women, like Garcia-Calderon, regularly moved across state lines from their homes in order to work at the brothel. The government also put on evidence that the brothel routinely used condoms manufactured outside the state of Maryland as part of its business, and that Lopez and Cerros-Cruz targeted the brothel because it was an illegal business taking in cash from its customers.

A reasonable jury could find from that evidence that robbery of the Langley Park brothel would have at least a *de minimis* effect on interstate commerce – and, aggregated with other similar acts, a measureable impact on commerce. *See Williams*, 342 F.3d at 354–55 ("The question is not simply whether one particular offense has a measurable

21

impact upon interstate commerce, but whether the relevant class of acts has such an impact."). That is sufficient to sustain Lopez's Hobbs Act conviction.[4]

**B.**

Lopez also argues that he is entitled to a new trial as a result of certain statements made by the government in its closing argument. In particular, Lopez points to what he contends was improper bolstering of a witness in the government's rebuttal. In his own closing argument, as described above, Lopez, in the course of urging the jury not to credit the testimony of the government's confidential informant, questioned why the government had not sought to corroborate that testimony with an account from the informant's cellmate. In response, the government reminded the jury of "testimony about how MS-13 retaliates," and suggested that alerting the cellmate – an MS-13 member – to its discussions with the confidential informant might have put the informant in jeopardy. S.A. 261.

Though Lopez did not object at trial to the government's statement, he did argue to the district court in his post-verdict motion that the statement was grounds for a new trial. The district court rejected that claim. First, the district court held, the government did not go outside the evidence before the jury and improperly vouch for the confidential informant, but instead asked the jury to draw from evidence introduced at trial – the

---

[4] Lopez also argues that the government failed to present sufficient evidence of the underlying robbery that is the basis for his Hobbs Act conviction. The district court rejected that claim, relying on record evidence from which a reasonable jury could conclude that the intruders had robbed Garcia-Calderon of her cell phone and also taken the wallet and watch of Cordon, the stabbing victim. We agree with the district court.

testimony of the confidential witness – the "sensible inference" that safety concerns would have been raised by interviewing the informant's MS-13 cellmate. J.A. 781. And in the alternative, the court concluded, even had the government's comment been improper, it was not so prejudicial as to warrant a new trial.

This court reviews a district court's ruling on an objection made during closing argument for abuse of discretion, and will reverse only where an abuse of discretion constitutes prejudicial error. *See United States v. Green*, 599 F.3d 360, 379 (4th Cir. 2010). And here, because Lopez did not raise an objection at trial, our review is more limited still: We may review only for plain error, *see United States v. Young*, 470 U.S. 1, 14 (1985), and grant relief only if there was a plain error that affected Lopez's substantial rights and would seriously affect the fairness, integrity or public reputation of judicial proceedings, *see United States v. Olano*, 507 U.S. 725, 732 (1993).

We need not decide whether the government's response to Lopez's closing argument was improper, because we agree with the district court that any hypothetical error did not prejudice Lopez so as to deny him due process and require a new trial. *See United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010) (closing argument violates due process rights only if it is improper and also "so prejudice[s] the defendant's substantial rights that the defendant was denied a fair trial"). To evaluate whether comments during a closing argument are prejudicial to the point of denying a fair trial, we consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; [] (4) whether the comments were deliberately placed before the jury to divert attention to

23

extraneous matters[;] . . . (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel[;] and (6) whether curative instructions were given to the jury.

*Id.* at 361 (internal quotation marks and citations omitted). Applying those factors to the government's statement here, as the district court concluded, "it is apparent that Lopez was not so severely prejudiced as to warrant a new trial." J.A. 782.

First, as the district court explained, the statement did not have any tendency to mislead the jury, as the jury reasonably could have inferred the same conclusion from testimony regarding MS-13 threats to members who cooperated with law enforcement. The statement also was isolated, limited to a few lines of rebuttal argument, and came in response to issues raised during Lopez's closing; Lopez has made no showing that the statement was intended as a diversionary tactic. And the statement did little to strengthen the "competent proof" of guilt, which was convincing and centered largely on entirely independent DNA evidence. Finally, although curative instructions were not given, Lopez's failure to object meant that the district court had no reason to believe that such instructions were necessary.

In sum, and weighing all of the relevant factors, we agree with the district court that Lopez cannot establish that any error "so prejudiced [his] substantial rights" that a new trial is warranted. *See Lighty*, 616 F.3d at 359. It follows *a fortiori* that Lopez cannot prevail on plain error review, where he must establish both an effect on substantial rights and an error of the kind that calls into question the fairness, integrity or public

24

reputation of judicial proceedings. Accordingly, we affirm the district court's denial of Lopez's motion for a new trial on this ground.[5]

## C.

Lopez raises additional grounds for a new trial with which we may dispense more briefly. First, Lopez argues that his due process rights were violated when the government proceeded on inconsistent theories of the case, originally pursuing Cerros-Cruz as the rapist and then arguing at Lopez's trial that it was Lopez who had raped Garcia-Calderon. As the district court recognized, we have stated that "the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003). *But see DeCastro v. Branker*, 642 F.3d 442, 458 (4th Cir. 2011) (qualifying *Higgs* statement as dicta). But as the court went on to explain, "here, there were no conflicting claims . . . regarding who was the sexual attacker": Cerros-Cruz pleaded guilty to Hobbs Act conspiracy, and "at no point during the proceedings against Cerros-Cruz or Lopez did the government commit itself to the position that Cerros-Cruz was the rapist." J.A. 780. That is sufficient to dispose of Lopez's claim.

---

[5] Lopez also challenges the government's statement, in its primary closing argument, that Garcia-Calderon "simply doesn't remember" the face of her attacker, S.A. 208, arguing that it is inconsistent with testimony that at one point Garcia-Calderon was able to identify Cerros-Cruz, based on the shape of his lips and mustache. Pointing to the fact that the government itself acknowledged at trial that Garcia-Calderon had tentatively identified Cerros-Cruz, as well as "considerable evidence" that Garcia-Calderon was not able to make a reliable identification, J.A. 780, the district court held that the government properly summarized Garcia-Calderon's testimony and that its description was supported by the trial evidence. We find no error in that determination.

25

Lopez also renews his objection to the district court's conditional admission of the DNA evidence taken from the knife sheath at the scene of the rape. As described above, Lopez moved to strike that evidence, arguing that a stain that developed on the brown paper bag holding the sheath could have contaminated the sample. The government's DNA expert witness testified that the stain did not affect the knife sheath itself and that it did not appear that the interior of the bag had been compromised; even if the interior had been compromised, she testified that the stain could not affect the DNA analysis unless the stain itself was caused by a "biological fluid that contained a lot of DNA." J.A. 684.

The district court denied Lopez's motion to strike, concluding that a reasonable jury could find that the DNA testing was unaffected by the stain. But because – in a "stretch[]" – a reasonable jury also could conclude that the DNA sample might have been compromised, J.A. 695, the district court admitted the DNA evidence conditionally under Federal Rule of Evidence 104(b), instructing the jury to consider it only if it credited the government's account of the storing and testing of the knife sheath. If, on the other hand, the jury was persuaded by Lopez that the DNA sample had been contaminated, then it was instructed to "disregard that DNA analysis." J.A. 738–39.

We review the district court's evidentiary ruling for abuse of discretion, *see United States v. Hornsby*, 666 F.3d 296, 307 (4th Cir. 2012), and find no such abuse here. Under Rule 104(b), when the relevance of evidence – here, the DNA testing results – turns on a conditional fact – here, that the DNA sample had not been contaminated – the evidence is admitted and the determination of the conditional fact left to the jury, so long as the "jury could reasonably find the conditional fact . . . by a preponderance of the

26

evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988). We have no reason to doubt the district court's determination that the government introduced sufficient evidence to allow a reasonable jury to conclude that the DNA sample was uncontaminated by the stain in question.[6]

## IV.

We turn finally to Lopez's challenge to his sentence. Lopez contends that his 20-year sentence is unreasonable, as compared to the ten-year sentence of his "more culpable co-defendant," Cerros-Cruz. Br. of Appellant at 54. In other words, Lopez asserts that his sentence is substantively unreasonable because of a sentencing disparity. We review the substantive reasonableness of a sentence for an abuse of discretion, *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010), and presume the reasonableness of a sentence, like Lopez's, that is within the Guidelines range, *United States v. Go*, 517 F.3d 216, 218 (4th Cir. 2008). We find no abuse of discretion here.

In *United States v. Allmendinger*, 706 F.3d 330, 344 (4th Cir. 2013), we rejected a sentencing disparity claim much like Lopez's. There, the defendant argued that his 540-month sentence for seven offenses relating to mail and securities fraud was substantively

---

[6] Nor is there any merit to Lopez's claim that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), in connection with the stain on the bag. As the district court explained, Lopez does not dispute that the government in fact turned over evidence related to the stain to the defense, nor that his counsel inspected the bag itself prior to trial. Though the district court went on to find in the alternative that any failure to disclose would not have been material, as is required to make out a *Brady* violation, we are content to affirm on the ground that the government fulfilled its obligations under *Brady*.

unreasonable because it was significantly higher than the ten-year sentence of his co-conspirator. *Id.* at 338, 344. We concluded that Allmendinger and his co-conspirator were situated differently, given that the co-conspirator had "admitted to his culpability" by entering into a plea agreement with the government and as a result had been permitted to plead guilty to only two conspiracy charges. *Id.* at 344. Absent a showing of "invidious discrimination by the government," we held we could not "second guess the government's exercise of its prosecutorial discretion," and the "district court simply was not required, in the name of avoiding unwarranted sentencing disparity, to treat Allmendinger as if he had been convicted only of the crimes to which [his co-conspirator] pled guilty." *Id.*

Lopez and Cerros-Cruz are likewise in dissimilar positions: Cerros-Cruz admitted to his culpability, and consequently was permitted to plead guilty to only one count of conspiracy, with an agreed-upon sentence of ten years. Lopez, on the other hand, opted, as was his right, to be tried by a jury, and was convicted of both the robbery and conspiracy counts against him. Lopez makes no showing – and we discern no trace – of any "invidious discrimination" in the government's charging decisions. *See id.* And like the district court in *Allmendinger*, *id.*, the district court in this case gave careful consideration to Lopez's argument regarding a potential disparity between his sentence and that of Cerros-Cruz, explaining why it did not believe it was required to impose identical sentences on the two defendants. Accordingly, we conclude that the district court was within its discretion in sentencing Lopez as it did.

## V.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*